**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNIVERSAL CONNECTIVITY TECHNOLOGIES INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:23-CV-00449-JRG |
| | § | |
| LENOVO GROUP LIMITED, | § | |
| | § | |
| Defendant. | § | |

# CLAIM CONSTRUCTION ORDER

Universal Connectivity Technologies Inc. ("UCT") alleges infringement by Lenovo Group Limited ("LGL") of claims from five patents generally relating to communications and connections between devices. U.S. Patents 7,154,905 and 7,746,798 relate "to communications between hosts and data store devices." '905 Patent at 1:51–53; '798 Patent at 1:52–54 (same). U.S. Patents 7,856,520 and 7,921,231 concern using a control bus for interconnecting different types of devices. '520 Patent at 1:7–10 (noting "[e]mbodiments of the invention" particularly relate "to a method and apparatus for a control bus for connection of electronic devices"); '231 Patent at 1:6–8 (noting "[e]mbodiments of the invention" particularly relate "to a method and apparatus for discovery of electronic devices utilizing a control bus"). Last, U.S. Patent 9,852,103 relates to "bidirectional transmission of Universal Serial Bus (USB) data using an Audio/Video (A/V) channel." '103 Patent at 1:18–19.

The parties present 17 disputes about claim scope. Having considered their briefing, along with arguments of counsel at a May 20, 2025 hearing, the Court resolves those disputes as follows.

# I. BACKGROUND

## A. U.S. Patents 7,154,905 and 7,746,798

The ’905 and ’798 Patents have the same specification and claim priority to the same provisional application. *See* ’905 Patent at [60]; ’798 Patent at [60]. Both patents “relate[] generally to communication techniques and particularly to communications between hosts and data store devices.” ’905 Patent at 1:51–53; ’798 Patent at 1:52–54.

The specifications disclose three high-level topics and several subtopics. The claims of the ’905 Patent are directed to the subject matter disclosed under the heading “1.4 Packet Preemption,” which “helps ensure that data store devices receive control packets as soon as possible without being slowed by network congestion as a result of data packets.” ’905 Patent at 19:65–20:1. As shown in Figure 13 (below), the transmitting device can interrupt the transmission of a data packet to transmit a control packet and then resume transmission of the data packet.




***Fig. 13***

The parties have one dispute from the ’905 Patent, which concerns Claim 21:

> 21. A communications device for transmitting packets via a communications link, comprising:
>
> a transmission component that transmits a first packet; and
>
> **a preemption component** that signals the transmission component to stop transmitting the first packet, transmits a preempt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet;
>
> wherein packets include in-band symbols and the indicators

> include one or more out-of-band symbols.

’905 Patent at 39:18–40:6 (emphasis added). The parties dispute whether “a preemption component” is a means-plus-function term and, if it is, whether the specification discloses corresponding structure for the term.

The claims of the ’798 Patent relate to using “synchronization primitives” to indicate the packet type, which is discussed under the heading “1.2 Synchronization Primitive and Packet Type.” *See generally* ’798 Patent at 14:31–18:15. “[A] primitive is defined as a sequence of two out-of-band symbols.” *Id.* at 25:64–65. An “out-of-band symbol” is a symbol “that does not normally appear within a packet because it may not have the same desirable characteristic as an in-band symbol (e.g., bit transitions not optimized).” *Id.* at 11:46–50.

As the patent explains:

> [t]he use of multiple synchronization primitives allows for encoding packet type within a synchronization primitive. In particular, the transport layer provides the packet type to the link layer. The link layer can then transmit a synchronization primitive that indicates packet type immediately before the packet itself.

*Id.* at 14:41–46. As recited in Claim 19:

> 19. A communications device for transmitting packet types of packets, comprising:
>
> **an identification component** that identifies a packet type of a packet of symbols; and
>
> a transmission component that transmits a synchronization symbol that corresponds to the identified packet type, the transmitted synchronization symbol providing synchronization information and each packet type having a different synchronization symbol and permitting an external receiving node to properly align with a **synchronization primitive** to be correctly aligned on a symbol boundary, and that transmits the symbols of the packet.

*Id.* at 38:22–33 (emphasis added). The parties dispute whether "a preemption component" is a means-plus-function term and, if it is, whether the specification discloses sufficient corresponding structure for that term. The parties also dispute the meaning of "synchronization primitive."

**B. U.S. Patent 7,856,520 and 7,921,231**

These patents relate to connections between electronic devices using only a single-bit bi-directional control bus. The patents explain "[t]he use of an interface designed for a standard device may be difficult for smaller devices," in part because "there is a physical limit on how many connections may be reasonably added to a smaller device." '520 Patent at 1:40–45. As a result, although two "standard" devices might send more complex control signals between them over multiple control lines, a modified-standard device might have fewer control lines arranged in a different configuration. *See, e.g.*, '231 Patent at fig.9 (showing different cable configurations for HDMI and HDMI-M standards), fig 10 (showing different pin numbers for different signals of the HDMI-M and HDMI protocols).

The patents teach using a single line bi-directional control bus between devices. '520 Patent at 1:57–60 (referring to "connecting a control bus between the transmitting device and the receiving device, the control bus being a bidirectional single-line bus"). To do so, the two devices communicate using a combination of discovery and control techniques that govern which device controls the bus at a given time. As shown in the state diagrams of Figures 4–5 (below), the receiver transitions between "disconnect," "mobile connect," and "standard connect" states, whereas the receiver transitions between "disconnect," "pending," and "discovered" states.




Fig. 4




Fig. 5

The disputes from the ’231 Patent come from Claims 10 and 16. Claim 10 recites:

> 10. A transmitting device comprising:
>
> a transmitter to transmit signals to a receiving device;
>
> a cable interface to couple with the receiving device, the cable interface including:
>
> a single-wire, bi-directional control bus, and a power bus powered by the receiving device;
>
> **logic to detect signals on the cable interface**, the logic including:
>
> **a first logic to detect a voltage value on the power bus**, the transmitter to transition from a disconnect state to a

pending state when a predetermined voltage is detected on the power bus by the first logic, the disconnect state indicating that the transmitting device is not connected to a receiving device, and

**a second logic to detect signals on the control bus**, the transmitter to drive a first signal value on the control bus **periodically** upon transitioning to the pending state, the transmitter to transition to a discovered state when the first signal value is detected by the second logic when the transmitter is not driving the signal value on the control bus, the discovered state indicating that the transmitter has been discovered by the receiving device.

'231 Patent at 12:52–13:7 (emphasis added). The parties dispute whether each of the "logic to . . . " terms are means-plus-function limitations. The parties also dispute whether "periodically" means from time to time or requires regular intervals.

Claim 16 includes similar language from the perspective of a receiving device:

16. A receiving device comprising:

a receiver to receive signals from a transmitting device;

an interface to be coupled with a transmitting device, the interface including a single-wire control bus and a power bus, the receiving device to enable a voltage potential of a predetermined value on the power bus and to drive a signal on the control bus at a first signal value in a disconnect state, the disconnect state indicating that the receiving device is not connected to a transmitting device; and

a switchable pull down circuit on the control bus;

**logic to discover a transmitting device coupled with the receiving device**, wherein the logic includes:

**a first logic to detect a first signal on the control bus**, the receiving device to discover a first type of transmitting device and transition to a first state when the first signal is detected, the receiving device to enable the switchable pull down circuit on the control bus and disable hot plug

> functionality upon discovering the first type of transmitting device, and
>
> **a second logic to detect a power signal from the receiving device**, the receiving device to discover a second type of transmitting device and transition to a second state when the power signal is detected.

'231 Patent at 13:23–14:11 (emphasis added). As with Claim 10, the parties dispute whether each of the "logic to . . ." terms are means-plus-function limitations.

The parties have similar means-plus-function disputes over "logic to . . ." terms from the '520 Patent. Claim 12 recites:

> 12. A transmitting device comprising:
>
> a connection to a single first control bus, the first control bus being a bi-directional, single-line bus, wherein the transmitting device is operable for coupling with a receiving device via the first control bus;
>
> **logic to convert each of one or more control signals into a data packet**, each of the one or more control signals being one of a plurality of different types of control signals for a **standard protocol**, each data packet including a plurality of bits to be transmitted;
>
> a transmitter, the transmitter to transmit the data packets to the receiving device on the first control bus; and
>
> **logic to arbitrate use of the first control bus**, the logic to arbitrate use being operable to:
>
> determine whether the control bus is in use by the receiving device, and
>
> if the first control bus is not in use by the receiving device, conduct arbitration for control of the first control bus, and wherein the receiving device is a device utilizing the **standard protocol** and the transmitting device is a mobile device utilizing a **modified protocol**, the **modified protocol** being a modification of the standard protocol that is not included in the **standard protocol**.

’520 Patent at 12:28–51 (emphasis added). Claim 19 recites similar limitations from the perspective of a receiving device:

> 19. A receiving device comprising:
>
> a connection to a single first control bus, the first control bus being a bi-directional, single-line bus, wherein the receiving device is operable for coupling with a transmitting device via the first control bus;
>
> a receiver to receive one or more data packets on the first control bus, each of the one or more data packets representing one of a plurality of different types of control signals;
>
> **logic to convert each of the one or more data packets into a control signal**; and
>
> **logic to arbitrate use of the first control bus**, the logic to arbitrate use being operable to:
>
> determine whether the control bus is in use by the transmitting device, and
>
> if the first control bus is not in use by the transmitting device, conduct arbitration for control of the first control bus, and wherein the receiving device is a device utilizing the standard protocol and the transmitting device is a mobile device utilizing a modified protocol, the modified protocol being a modification of the standard protocol that is not included in the standard protocol.

*Id.* at 13:6–14:3 (emphasis added). In addition, the parties dispute whether “standard protocol” and “modified protocol” must be limited to protocols in existence on the patents’ effective filing dates.

### C. U.S. Patent 9,852,103

The ’103 Patent relates to “bidirectional transmission of Universal Serial Bus (USB) data using an Audio/Video (A/V) channel.” ’103 Patent at 1:18–19. The patent explains a difficulty in transferring both high resolution videos and USB data over USB links at the same time due to different technical requirements and limitations associated with certain standards. *Id.* at 1:31–35.

Specifically, "[d]igital video standards, such as HDMI and MHL do not provide synchronous mechanisms for bidirectional USB data exchange between a source device and a sink device." *Id.* at 1:38–41.

To address the problem, the patent teaches having the source device send data units to the sink device at first times and the sink device send data units to the source device at second times between transmissions from the source device. The first and second times do not overlap, and synchronization signals may be added to the first and second data units to align character symbols embedded in that data. *See generally* '103 Patent at 1:51–67.

The parties' sole dispute from this patent relates to Claim 17, which recites:

> 17. The method of claim 11, further comprising aligning a boundary of a symbol in a first forward unit of data of the forward units of data using the first synchronization signal.

'103 Patent at 11:40–42. Claim 11, however, does not introduce a "first synchronization signal." *See id.* at 10:61–11:12. Because of that lack of an antecedent, UCT seeks to judicially correct the claim to depend from Claim 12 instead of Claim 11.

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g,* 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical*

*Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the

public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Means-Plus-Function Claiming[1]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online*, *LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

But § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means for" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir.

---

[1] The patents involving means-plus-function disputes have effective filing dates before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3, 125 Stat. 284–93 (2011). The Court therefore refers to the pre-AIA version of the statute.

2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

Construing a means-plus-function limitation involves multiple steps. Step 1 "is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Step 2 "is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citations and quotations omitted). The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"[S]tructure can be recited in various ways, including [by using] 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (quoting *Apple Inc.*

*v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). For § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must usually include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In that case, the corresponding structure is not a general-purpose computer but rather the special-purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909.

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc*., 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of

and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party addresses the level of ordinary skill in their briefing. Both experts, however, characterize a skilled artisan as one having "a bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent training and three years of work experience with data communications systems or interfaces, including at least some experience with serial or display data communications systems or interfaces." Madisetti Decl., Dkt. No. 109-2 ¶ 40; Lee Decl., Dkt. No. 113-9 ¶ 23. The Court adopts this characterization for the purpose of construing the disputed terms.

## IV. THE DISPUTED TERMS

### A. "preemption component" ('905 Patent, Claims 21)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**<u>Function:</u>** "signals the transmission component to stop transmitting the first packet, transmits a preempt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet"<br>**<u>Structure:</u>** 20:3–25, Fig. 13 and 20:31–37, Fig. 14 and 20:50–67, and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**<u>Function:</u>** [i] signaling the transmission component to stop transmitting the first packet, [ii] transmitting a pre-empt indicator indicating that a second packet is to be transmitted, [iii] transmitting the second packet, and [iv] signaling the transmission component to continue transmitting the first packet<br>**<u>Structure:</u>** Indefinite |

Claim 21 recites "a transmission component" and "a preemption component that [1] signals the transmission component to stop transmitting the first packet, [2] transmits a preempt indicator

indicating that a second packet is to be transmitted, [3] transmits the second packet, and [4] signals the transmission component to continue transmitting the first packet." '905 Patent at 39:18–40:6. The parties dispute whether this is a means-plus-function term and, if it is, whether the specification discloses sufficient corresponding structure to avoid an indefiniteness holding. Neither "transmission component" nor "preemption component" appear in the patent outside of the claims.

*1. Whether this is a means-plus-function term*

UCT gives three reasons why this term is not governed by § 112 ¶6. First, citing other cases from this Court, UCT says "component" is not a nonce term. Dkt. No. 109 at 2. Second, says UCT, the claims "delineate" the "preemption component" as a structural component that interacts with other structural elements. *Id.* at 2–3. Third, "the structural nature of the [term] is detailed in the specification," in part because the specification "delineates the 'inputs and outputs' of the [term]." *Id.* at 4–6.

LGL, however, focuses on the four functions the "preemption component" supposedly performs. It points to cases considering "component" a means-plus-function term, and stresses the "preemption component" does not appear in the Detailed Description. Dkt. No. 113 at 4.

Figure 13 (below) and the related description disclose the relevant subject matter:

> When the packet is to be preempted, the communications node then transmits the preempt primitive 1302. After transmitting the preempt primitive, the transmitting communications node transmits the preempting control packet 1303. After the control packet is transmitted, the communications node transmits the continue primitive 1304, and then resumes transmitting the remainder of the preempted data packet 1305.

'905 Patent at 20:30–39.




***Fig. 13***

This is not a means-plus-function limitation. First, the claim does not use the term "means," so the Court starts with a presumption that § 112 ¶ 6 does not apply. Second, the claim is not written in typical means-plus-function form—that is, reciting a "component for" performing some function. Instead, the limitation states the steps implemented by the component. In that way, this claim is akin to the claims at issue in another case on which UCT relies, *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336 (Fed. Cir. 2013) (recognizing, in a dispute over whether the phrase "digital logic means" was a means-plus-function term, "[t]he claims do not recite a function for the digital logic means to perform" and "recite[] that the digital logic means is comprised of structural elements, including a system memory and specific modules and subsystems").

Here, what LGL calls "functions" are actually "acts within the claim itself to perform entirely" what the recited function would have been if the limitation was structured in conventional means-plus-function format. *See Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim recites "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means'" (quotation marks and citation omitted)). Accordingly, the Court holds this is not a means-plus-function limitation, and this term should be given a "plain and ordinary meaning" construction.

### B. "an identification component that identifies a packet type of a packet of symbols" ('798 Patent, Claim 19)

| UCT's Construction | LGL's Construction |
| --- | --- |
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**Function:** identifies a packet type of a packet of symbols<br>**Structure:** 8:31–33, 9:12–22, 15:4–8, 15:12–14, Fig. 10 and 18:46–57, Fig. 11 and 18:58–19:10, and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** identifies a packet type of a packet of symbols<br>**Structure:** Indefinite |

Claim 19 recites:

> 19. A communication device for transmitting packet types of packets, comprising:
>
> an identification component that identifies a packet type of a packet of symbols; and
>
> a transmission component that transmits a synchronization symbol that corresponds to the identified packet type, the transmitted synchronization symbol providing synchronization information and each packet type having a different synchronization symbol and permitting an external receiving node to properly align with a synchronization primitive to be correctly aligned on a symbol boundary, and that transmits the symbols of the packet.

'798 Patent at 38:22–33. The related portion of the specification falls under the heading "1.2 Synchronization Primitive and Packet Type," which explains "[t]he use of multiple synchronization primitives allows for encoding packet type with a synchronization primitive. In particular, the transport layer provides the packet type to the link layer. The link layer can then transmit a synchronization primitive that indicates packet type immediately before the packet itself." *Id.* at 14:41–44.

The parties dispute whether this is a means-plus-function term. If it is, they dispute whether the patent discloses adequate corresponding structure to avoid an indefiniteness holding.

*1. Whether "identification component" is a means-plus-function term*

As with the previous term, the Court starts with the presumption that § 112 ¶ 6 does not apply due to the absence of the word "means." But unlike the previous term, the limitation follows the "conventional" means-plus-function format, and "component" can be subject to means-plus-function treatment. *See Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F. Supp. 3d 586, 622 (E.D. Tex. 2019) (concluding "navigation element handler component" and "navigation director component" were means-plus-function terms); *Umbanet, Inc. v. Epsilon Data Mgmt., LLC*, No. 2:16-CV-00682-JRG, 2017 WL 3508771, at *8 (E.D. Tex. Aug. 16, 2017) (concluding "document-encoding component" was a means-plus-function term); *see also Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, No. 1:10-cv-910 (LMB/JFA), 2018 U.S. Dist. LEXIS 60078, at *56 (E.D. Va. 2018) (concluding "enhancement component" was a means-plus-function term). Also, UCT has not established "identification component" is a name for sufficiently definite structure. Accordingly, the Court holds this is a means plus-function term.

*2. Whether the patent discloses corresponding structure for the "identification component"*

According to LGL, "[a]t most, the specification describes only that certain functions may be performed by a 'transport layer' of a 'communications node.'" Dkt. No. 113 at 13. And because the patent "fails to describe any particular algorithm in such circuits or firmware to carry out the functions to be performed by the 'identification component,'" the term is indefinite. *Id.*

The Court disagrees. LGL correctly notes that many of the excerpts on which UCT relies do not disclose corresponding structure for the "identification component." Some of the excerpts

simply restate the function in the context of receiving packets. *See, e.g.*, '798 Patent at 8:31–33 ("When receiving data, the transport layer receives the codes of transaction from the link layer and identifies the packets."), 9:12–22 ("The receive controller controls the depacketizer to receive codes provided by the link layer, identify the packets, and store the codes as packets in the receive memory."). This claim, however, is directed to *transmitting* packets rather than receiving them, because the recited "transmission component" "transmits a synchronization symbol that corresponds to the identified packet type." *Id.* at 38:26–27.

Notably, the transport layer must perform the identification, because that layer "provides the packet type to the link layer." '798 Patent 14:44–45; *see also id.* at 15:4–8 ("Immediately prior to transmitting control packet 902 (e.g., command, status, or message packets), the transport layer of the transmitting communications node signals the link layer that a control packet is to be transmitted next."), 15:12–14 ("Immediately before the transport layer transmits data packet 904, it notifies the link layer that a data packet is to be transmitted."). The "transmission component" exists in the link layer, which receives the packet type from the transport layer and "can then transmit a synchronization primitive that indicates packet type immediately before the packet itself." *Id.* at 14:44–45.

Figure 12 (below) is most relevant, which describes "processing of packets stored in the packet memory." '798 Patent at 19:11–12. As the patent explains:

> In decision block 1201, if the control queue is empty, then the component continues to block 1203, else the component retrieves a control packet from the control queue in block 1202 and continues at block 1205. In decision block 1203, if the data queue is empty, then the component again checks for a packet in the control queue, else the component retrieves a packet from the data queue in block 1204 and continues at block 1205.

*Id.* at 19:13–16.




**FIG. 12 of the '798 Patent**

This is the only disclosure of how to determine the packet type in the specification, after which the packet type must be sent to the link layer. Accordingly, the Court holds that the corresponding structure is "a general-purpose processor, special-purpose processor, or logic circuit programmed to determine whether the packet was removed from a control queue or a data queue, and send an indication of whether the packet was removed from the control queue or the data queue to the transport layer."[2]

---

[2] At the hearing, the Court proposed a preliminary construction that required identifying the packet type from the header, citing column 8, lines 29–43. That section discusses both transmitting and receiving data packets, and the reference to identifying the packet from the header relates to *receiving* data packets, not *transmitting* them.

### C. "logic to convert each of one or more control signals into a data packet" ('520 Patent, Claim 12)

### "logic to convert each of the one or more data packets into a control signal" ('520 Patent, Claim 19)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**Function:** "convert each of one or more control signals into a data packet" [cl. 12] / "convert each of the one or more data packets into a control signal" [cl. 19]<br>**Structure:** 1:65–2:1, 3:34–37, 7:28–38, 10:3–10, Fig. 2 (214), 7:42–47, and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** convert each of one or more control signals into a data packet, each of the one or more control signals being one of a plurality of different types of control signals for a standard protocol, each data packet including a plurality of bits to be transmitted [cl. 12] / "convert each of the one or more data packets into a control signal" [cl. 19]<br>**Structure:** Indefinite |

These terms implicate the transmitting and receiving devices of the claims when they are connected. Generally, because of hardware limitations, the transmitting device of Claim 12 converts control signals into a data packet and transmits the data packet to a receiving device that embodies Claim 19, which converts the data packets back into control signals.

The parties dispute whether these are means-plus-function terms and, if they are, whether the patent discloses corresponding structure.

#### *1. Whether these are means-plus-function terms*

After noting the presumption against means-plus-function treatment due to the absence of the word "means," UCT makes two arguments for why these are not § 112 ¶ 6 terms. First, the claims describe various structural components—like "control bus," "transmitter," and "receiver"—and how they interact with the recited "logic." Dkt. No. 109 at 12. Second, the claims describe the "objectives and operations" of the system. *Id.*

In its response, LGL says that, in almost identical circumstances, "[t]he Federal Circuit has determined . . . that claim limitations reciting 'logic to' perform a function are means-plus-function limitations." Dkt. No. 113 at 14 (citing *Egenera, Inc. v. Cisco Sys, Inc.*, 972 F.3d 1367 (Fed. Cir. 2020). Moreover, in its view, "logic" at the time of the effective filing date was not used to refer to specific structure, but rather general principles, operations, or functions underlying a computer. LGL accuses UCT of effectively rewriting the "logic" terms to "logic circuit" terms. *Id.* at 16.

These are means-plus-function terms. First, UCT has not established these terms connote sufficiently definite structure to a skilled artisan. For one, the limitation is written in a conventional means-plus-function format. Moreover, UCT's position is devoid of any analysis of the term from a skilled artisan's perspective. At most, UCT has established this is structure, which is not the question and wasn't in doubt. Rather, UCT must establish a skilled artisan would understand what structure or class of structures the claim is referencing.[3]

UCT cites *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336 (Fed. Cir. 2013), for the proposition that "the word 'logic,' like 'circuit' or 'processor,' may connote sufficiently definite structure and is not a 'nonce' or 'functional' word that is subject to" § 112 ¶ 6. Dkt. No. 109 at 10–

---

[3] During the hearing, for example, UCT repeatedly referred to "hardware functionality" as if that was sufficient to meet the "corresponding structure" requirement. *See, e.g.*, Hr'g Tr., Dkt. No. 194 at 27:20–25 (explaining the "logic to convert" terms "could not be performed in software by itself" and "would need to be implemented in hardware functionality"), 38:23–39:1 (asserting "the 'logic to convert' and 'logic to arbitrate' is specifically tied to hardware functionality"), *id.* at 43:4–8 ("[W]ith respect to the "logic-to-discover" terms, the specification provides further confirmation to the claims that the logic to discover is, again, tied to hardware functionality by explaining that the signals on the control bus are used for device discovery."). But UCT never indicated what hardware was implementing that functionality in the specification. *See, e.g.*, *id.* at 43:17–44:5 (asserting the "logic to discover a transmitting device" "could be any type of hardware component—any type of logic circuit that is able to discover the transmitting device."

11. The Court agrees that mere use of the word "logic" is not sufficient to treat the limitation as a means-plus-function term. Regardless, *TecSec* is distinguishable.

In *TecSec*, the claim recited:

> digital logic means, the digital logic means comprising:
>
> 1) a system memory means for storing data;
> 2) an encryption algorithm module, comprising logic for converting unencrypted objects into encrypted objects, the encryption algorithm module being electronically connected to the system memory means for accessing data stored in the first system memory;
> 3) an object labelling subsystem, comprising logic means for limiting object access, subject to label conditions, the object labelling subsystem being electronically connected to the system memory means for accessing data stored in the system memory means and the object labelling subsystem being further electronically connected to the encryption algorithm module to accept inputs from the encryption algorithm module;
> 4) a decryption algorithm module, comprising logic for converting encrypted objects into unencrypted objects, the decryption algorithm module being electronically connected to the system memory means for accessing data stored in the system memory means; and
> 5) an object label identification subsystem, comprising logic for limiting object access, subject to label conditions, the object label identification subsystem being electronically connected to the system memory means for accessing data stored in the system memory means and the object label identification subsystem being further electronically connected to the decryption algorithm module to accept inputs from the decryption algorithm module . . . .

*TecSec, Inc. v. IBM*, 731 F.3d 1336, 1339 (Fed. Cir. 2013). The court first recognized that "[t]he claims do not recite a function for the digital logic means to perform." *Id.* at 1348. The court then

noted the claim "recites that the digital logic means is comprised of structural elements, including a system memory and specific modules and subsystems." *Id.* Ultimately, the court saw "no reason to hold that those elements are so devoid of structure as to implicate § 112, ¶ 6." *Id.*

Here, however, the "logic to convert" limitations do not recite any structural elements like "a system memory," but only the functions of converting signals into packets (at the transmitter) and packets into signals (at the receiver).

*2. The corresponding structure*

The parties generally agree on the recited function for the corresponding-structure inquiry.[4] Most of the excerpts UCT identifies, however, don't describe steps for performing the recited function. *See, e.g.*, '520 Patent at 1:65–2:1 (restating the result that "[o]ne or more control signals are converted to one or more data packets"), 3:34–37 (same), 10:3–10 (reciting boilerplate language that the various processes "may be performed by hardware components or may be embodied in computer program or machine-executable instructions [or] a combination of hardware or software").

Two figures provide some detail. First, Figure 7 (below) shows the underlying problem. That figure identifies the pin numbers for various HDMI-M signals and standard HDMI signals. Looking at Pin 13 for both standards, for example, HDMI-M does not use that pin, whereas the standard HDMI protocol uses that pin for CEC (Consumer Electronics Control), which "is an optional protocol that provides high-level control functions between all of the various audiovisual products in a user's environment." '520 Patent at 3:15–17. Similarly, whereas HDMI-M uses Pins

[4] LGL includes, within its proposed function for Claim 12, language that limits what the control signals can be.

15–16 for USB Data, HDMI uses those pins for DDC (Display Data Channel) clock signals (SCL) and data (SDA). "In HDMI, DDC is used for configuration and status exchange between a single source (a "source" being a device providing HDMI output) and a single "sink" (a sink being a device receiving an HDMI input)." *Id.* at 3:11–15. Thus, to convey CEC commands to an HDMI-M device from a standard HDMI device, that information must be transferred some other way.

710 720 730 7/9

| PIN | HDMI-M Signal assignment | Standard HDMI Signal assignment |
|---|---|---|
| 1 | NC | TMDS Data2+ |
| 2 | NC | TMDS Data2 Shield |
| 3 | NC | TMDS Data2- |
| 4 | NC | TMDS Data1+ |
| 5 | NC | TMDS Data1 Shield |
| 6 | NC | TMDS Data1- |
| 7 | TMDS Data+ | TMDS Data0+ |
| 8 | TMDS Data Shield | TMDS Data0 Shield |
| 9 | TMDS Data- | TMDS Data0- |
| 10 | TMDS Clock+ | TMDS Clock+ |
| 11 | TMDS Clock Shield | TMDS Clock Shield |
| 12 | TMDS Clock- | TMDS Clock- |
| 13 | NC | CEC |
| 14 | 5V power from RX | Reserved (NC) |
| 15 | USB Data+ | DDC SCL |
| 16 | USB Data- | DDC SDA |
| 17 | GND | DDC/CEC GND |
| 18 | NC | +5V power from TX |
| 19 | Ctrl Bus | Hot Plug Detect |

**Fig. 7**

To do that, the patent explains:

> [T]he control signals are converted from bytes of data to data packets that identify the type of data within each packet. . . . If there is a control signal to be transmitted 212, the signal is converted into a data packet for transmission. . . . [T]he data packet may be a data packet as shown in FIG. 8. The data packet is then transmitted

from the transmitter to the receiver over the single-bit control bus 216.

'520 Patent at 7:29–39. The patent describes this as "mapping" standard control protocols to the 1-bit data line using a "translation layer." *See id.* at 3:4–11 ("a translation layer will describe how standard control protocols may be mapped to the 1-bit line").

Figure 8 (below) shows the results of the conversion. As the patent explains:

> [C]ontrol data from multiple sources is merged or multiplexed onto a single-bit control bus. In an embodiment, control data bytes are formed into data packets for transfer on the control bus. In an example, the data packet may be data packet 800. . . . In this example, data packet 802 includes a 1-bit sync signal 802, followed by a 2-bit header 804 to indicate the type of data packet contained in the data packet 800 and a 1-bit control field 806 to indicate whether the data packet contains data or a command. The numbers of bits included in each field may vary in different implementations. . . .
>
> The header 804 and control field 806 may, for example, be encoded as provided in FIG. 9. The control field is followed by 8 bits of translation layer data or command 808.

*Id.* at 9:16–37.




**FIG. 8 of the '520 Patent**

As shown in Figure 9 (below), the transmitter uses the two header bits to indicate whether the data packet is a DDC packet, a CEC packet, or private channel data. The transmitter uses the control field to indicate that the data 808 represents data or a command.

910

| Header Bits | |
|---|---|
| **Header Field** | **Description** |
| 00 | DDC packet |
| 01 | CEC packet |
| 10 | Private channel for control bus |
| 11 | Reserved |

920

| Control Field | |
|---|---|
| **Control Field** | **Description** |
| 0 | Following 8 bits are translation layer data |
| 1 | Following 8 bits are translation layer command |

**FIG. 9 of the ’520 Patent**

Based on the forgoing, the Court holds the corresponding structure for the “logic to convert” limitation of Claim 12 to be “a general-purpose processor, special-purpose processor, or logic circuit programmed to form control signal bytes into data packets that include (1) a header field indicating the type of the packet, and (2) a control field identifying whether the packet is carrying data or a command, and equivalents thereof.” The reverse is true for Claim 19, for which the Court holds the corresponding structure is “a general-purpose processor, special-purpose processor, or logic circuit programmed to (1) identify the packet type from a header of a received packet, and (2) identify whether the packet is data or a command from a control field of the received packet, and equivalents thereof.”

**D. "logic to arbitrate use of the first control bus" ('520 Patent, Claim 12)**
**"logic to arbitrate use of the first control bus" ('520 Patent, Claim 19)**

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**Function:** "arbitrate use of the first control bus by determining whether the control bus is in use by the receiving device and, if the first control bus is not in use by the receiving device, conducting arbitration for control of the first control bus" [cl. 12] / "arbitrate use of the first control bus by determining whether the control bus is in use by the transmitting device and, if the first control bus is not in use by the transmitting device, conducting arbitration for control of the first control bus" [cl. 19]<br>**Structure:** Fig. 2 (206), Fig. 3, 3:53–55, 4:60–67, 5:1–67, 7:17–28, 7:48–8:12, 8:37–39, 10:3–10, and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** to arbitrate use of the first control bus, the logic to arbitrate use being operable to: [i] determine whether the control bus is in use by the receiving device, and [ii] if the first control bus is not in use by the receiving device, conduct arbitration for control of the first control bus [cl. 12] / to arbitrate use of the first control bus, the logic to arbitrate use being operable to: [i] determine whether the control bus is in use by the transmitting device, and [ii] if the first control bus is not in use by the transmitting device, conduct arbitration for control of the first control bus [cl. 19]<br>**Structure:** a general-purpose processor, special-purpose processor, or logic circuit programmed with instructions to perform Steps 304–322 of Figure 3 |

The parties dispute whether these are means-plus-function terms and, if they are, whether the specification discloses corresponding structure sufficient to avoid an indefiniteness holding. The parties agree on the recited function if this is a § 112 ¶ 6 term, and both parties agree that Figure 3 shows corresponding structure.

*1. Whether these are means-plus-function limitations*

The parties make the same arguments they do for the previous "logic to . . ." terms.[5]

[5] Both parties combine their respective briefing for all the "logic to . . ." terms concerning whether those terms invoke § 112 ¶ 6. *See* Dkt. No. 109 at 10–18; Dkt. No. 113 at 14–18.

Summarizing those arguments, UCT says "logic" is structural, Dkt. No. 109 at 11–18, and LGL responds that, at the time of invention, "the term 'logic' was not used to refer to any specific structure in the art, but rather to generally refer to the principles, operations, or functions underlying a computer," Dkt. No. 113 at 15.

This is a means-plus-function term. Despite the presumption against that conclusion from the absence of the word "means," UCT fails to show that this language connotes sufficiently definite structure to a skilled artisan. Rather, as with the other terms, UCT merely asserts the term is structural in nature, asserting that, because it is operably connected to other structure, it, too, must be structure. UCT does not explain, however, why the "objectives and operations" of the recited system could "inform the structural character of the limitation-in-question." *See, e.g.*, *Williamson*, 792 F.3d at 1351 (noting that "[w]hile portions of the claim do describe certain inputs and outputs at a very high level . . . , the claim does not describe how the 'distributed learning control module' interacts with other components in the distributed learning control server in a way that might inform the structural character of the limitation-in-question").

*2. Whether the specification discloses corresponding structure*

The parties agree on the recited function, but dispute the corresponding structure. The parties generally agree that Figure 3 discloses corresponding structure, but UCT also identifies several other excerpts from the specification. Those excerpts, however, either don't relate to an algorithm for performing the recited function or refer to the algorithm shown in Figure 3. *See* '502 Patent at fig.2 (item 206, which reflects the recited function rather than an algorithm for performing that function), 3:53–55 ("The bus control logic may then move to an arbitration phase to gain control of the bus, which is described in more detail below."), 4:60–67 (noting only that, "[i]n an embodiment, the control bus may be implemented . . . such that one of the devices (generally the

transmitter) will win the arbitration if both devices attempt to gain control of the control bus at approximately the same time"), 7:17–28 (referring to "the arbitration process illustrated in FIG. 3"), 5:1–67 (describing the algorithm shown in Figure 3, in addition to algorithms for perform other functions), 7:48–8:12 (describing Figure 3), 8:37–39 (referring generally to "an arbitration process"), 10:3–10 (reciting boilerplate language that the various processes "may be performed by hardware components or may be embodied in computer program or machine-executable instructions [or] a combination of hardware or software"). Because only Figure 3 and the related text disclose structure for performing the recited function, the corresponding structure for these terms is "a general-purpose processor, special-purpose processor, or logic circuit programmed with instructions to perform Steps 304–322 of Figure 3, and equivalents thereof."

### E. "first logic to detect a voltage value on the power bus" ('231 Patent, Claim 10)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**Function:** detect a voltage value on the power bus"<br>**Structure:** 2:7–10, 3:24–26, 4:13–16, 6:36–39, 7:38–44, 8:25–27, 8:55–59, 8:67–9:3, 10:35–42, Fig. 7 (706), Fig. 8 (812), and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** detect a voltage value on the power bus<br>**Structure:** Indefinite |

The parties dispute whether this is a means-plus-function term and, if it is, whether the specification discloses adequate corresponding structure to avoid an indefiniteness holding. UCT's arguments mirror those concerning the '520 Patent's claim language. Specifically, UCT says the '231 Patent teaches that the recited "logic" may refer to "functionality implemented" by a "logic circuit," which refers to a well-known class of structures. Dkt. No. 109 at 16. UCT also says the

specification elaborates on the inputs and outputs, and Figures 7 and 8 provide additional detail, which together show the term is structural. *Id.* at 17.

This is a means-plus-function term. As with the previous "logic to . . ." terms, UCT does not establish that the term connotes a specific type of structure or a class of structures. Instead, UCT asserts that the "logic" is structure. But what would a skilled artisan understand that structure to be? And though, as UCT asserts, the recited "logic" may refer to "functionality implemented" by a "logic circuit," that says nothing about the structure (i.e., the algorithm) actually being implemented.

Turning to the question of corresponding structure, LGL correctly notes many of the portions of the specification to which UCT points merely repeat the same functional language from the claim. *See, e.g.*, '231 Patent at 2:7–10 ("If the transmitting device is in a disconnect state and a pre-determined voltage is detected on the power bus, the transmitting device is transitioned to a pending state . . . ."), 3:24–26 ("[A] transmitting device and a receiving device each further include logic to detect power signals that are received."), 4:13–16 ("The transmitter detects presence of a +5V power signal from the receiver on a 5V Power pin, and transitions to the pending state."), 6:36–39 ("[A] transmitting device may detect the presence of the receiver power signal (such as a 5 volt power signal) in device discovery."), 7:38–44 ("[T]he transmitter transitions to the pending state 504 upon detecting a logical '1' (+5V) on the VBUS 508."), 8:25–27 ("The transmitter detects the +5V on the VBUS . . . .), 8:55–59 ("[T]he HDMI transmitter chip 812 and HDMI-E receiver chip 832 include logic to detect signals on the control bus."), 8:67–9:3 ("The transmitter detects the presence of the receiver's +5V power provided on the transmitter's power/wake enable (PWR/WAKE_EN) pin . . . .), 10:35–42 (reciting boilerplate language that the various processes "may be performed by hardware components or may be embodied in computer program or

machine-executable instructions [or] a combination of hardware or software").

UCT does, however, identify the HDMI-M transmitter chip (Fig. 8, item 812) as corresponding structure for this term. In fact, as shown *supra*, many of the passages to which UCT cites explain that transmitter chip detects the voltage. LGL's objection to the transmitter as the corresponding structure is that the claim "expressly identifies 'a transmitter' as a separate and different claim element. . . . The separate transmitter is thus not adequate corresponding structure for performing the "logic to" functions recited in the claims . . . ." Dkt. No. 113 at 21.

There is corresponding structure. Clearly, this logic must involve some hardware because it detects a voltage on a bus. And while the transmitter is a separate element of the claims, the specification is clear that the "logic" is part of the transmitter. *See* '231 Patent at 3:24–26 ("[A] transmitting device and a receiving device each further include logic to detect power signals that are received."), 8:55–59 ("[T]he HDMI transmitter chip 812 and HDMI-E receiver chip 832 include logic to detect signals on the control bus."). Given this disclosure and the figures, a skilled artisan would understand the "logic to detect" to be a voltage detector internal to the transmitter chip and connected to an input pin of the transmitter. The output of the detector, which is internal to the transmitter chip, provides the indication of whether the voltage has been detected. Accordingly, the Court holds the corresponding structure to be "a voltage detector with an input connected to the pin of the transmitter that is connected to the power bus, and equivalents thereof."

### F. "second logic to detect signals on the control bus" ('231 Patent, Claim 10)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke 112 ¶ 6. Alternatively, should 112 ¶ 6 apply:<br>**Function:** "detect signals on the control bus"<br>**Structure:** 2:10–15, 3:22–24, 4:31–33, 7:47–53, 7:59–62, 8:31–36, 8:55–58, 9:20–22, 10:35–42, Fig. 7 (712), Fig. 8 (812), and equivalents thereof" | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** detect signals on the control bus<br>**Structure:** Indefinite |

This dispute is like the dispute about the "first logic" discussed *supra*, and for the same reasons the Court holds this is a means-plus-function term. The parties agree on the recited function.

Regarding corresponding structure, UCT again identifies several excerpts that merely recite the function or claim language. *See, e.g.*, '231 Patent at 2:10–15 ("If . . . a value of the signal pulse is detected on the control bus when the signal is not being driven . . . ."), 3:22–24 ("a transmitting device and a receiving device each include logic to detect signals on the control bus"), 4:31–33 ("If the transmitter detects that the control bus is low when the transmitter is not driving it . . . ."), 7:47–53 ("[T]he transmitter monitors the value on the CBUS while in the pending state 504 during the time when the CBUS is not being driven by the transmitter. If the transmitter detects a high value on the CBUS . . . ."), 7:59–62 ("if a long low signal is detected on the CBUS while the transmitter is in the discovered state 514, the transmitter will transition back to the pending state 504"), 8:31–36 ("As a result of the pull-down circuit, the transmitter detects that the CBUS signal is low when the transmitter is not driving a pulse on the control bus . . . ."), 9:20–22 ("When the transmitter 810 detects that the CBUS 802 is low when it is not driving it, it transitions to the

discovered state and stops pulsing the CBUS."), 10:35–42 (reciting boilerplate language that the various processes "may be performed by hardware components or may be embodied in computer program or machine-executable instructions [or] a combination of hardware or software").

But like the "first logic," there is corresponding structure. The limitation recites the "second logic to detect signals, . . . the transmitter to transition to a discovered state when the first signal value detected by the second logic." As shown in Figure 5, the transmitter state depends on whether the CBUS is low or high, and for how long. A skilled artisan would therefore understand the "second logic" is, similar to the "first logic," "a voltage detector with an input connected to the pin of the transmitter that is connected to the control bus, and equivalents thereof"

### G. "first logic to detect a first signal on the control bus" ('231 Patent, Claim 16)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**<u>Function:</u>** detect a first signal on the control bus"<br>**<u>Structure:</u>** Abstract, 1:62–65, 3:22–24, 4:24–30, 4:40–42, 7:4–9, 8:27–31, 8:55–58, 9:13–19, 10:35–42, Fig. 7 (710), Fig. 8 (832), and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**<u>Function:</u>** detect a first signal on the control bus<br>**<u>Structure:</u>** Indefinite |

This is a similar dispute to the dispute about the "first logic" of Claim 10, but concerns the receiver rather than the transmitter. For the same reasons, the Court holds this is a means-plus-function term and the corresponding structure is "a voltage detector with an input connected to the pin of the receiver that is connected to the control bus, and equivalents thereof."

### H. "second logic to detect a power signal" ('231 Patent, Claim 16)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**<u>Function:</u>** "detect a power signal from the transmitting device"<br>**<u>Structure:</u>** Abstract, 1:65–2:3, 3:24–26, 6:54–7:3, 7:17–21, 8:9–19, 8:55–59, 10:35–42, Fig. 8 (832), and equivalents thereof" | Subject to 35 U.S.C. § 112 ¶ 6<br>**<u>Function:</u>** detect a power signal from the transmitting device<br>**<u>Structure:</u>** Indefinite |

For the reasons set forth with reference to "first logic to detect a voltage value on the power bus," the Court holds this is a means-plus-function term with the structure of a "a voltage detector with an input connected to the pin of the receiver that is connected to a power signal line, and equivalents thereof."[6] *See* '231 Patent at 6:54–56 ("[T]he receiver transitions from the cable disconnect state 402 to the standard device connect state upon detecting a +5 V power signal from the transmitter 408."), 9:43–45 (noting "[t]he cable may include other lines, such as a +5 V power signal line, a hot plug detect, and a USB data channel, which are not illustrated here.").

[6] The claim recites "a second logic to detect a power signal from the *receiving* device." '231 Patent at 14:8–9 (emphasis added). Given their agreement as to the recited function, the parties seem to acknowledge this is a drafting error and that the power signal to be detected comes from the *transmitting* device.

### I. "logic to detect signals on the cable interface" ('231 Patent, Claim 10) "logic to discover a transmitting device" ('231 Patent, Claim 16)

| Term | UCT's Construction | LGL's Construction |
|---|---|---|
| "logic to detect signals on the cable interface" ('231 Patent, Claim 10) | No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**<u>Function:</u>** detect signals on the cable interface<br>**<u>Structure:</u>** 2:7–10, 3:24–26, 4:13–16, 6:36–39, 7:38–44, 8:25–27, 8:55–59, 8:67–9:3, 10:35–42, Fig. 7 (706), Fig. 8 (812), 2:10–15, 3:22–24, 4:31–33, 7:47–53, 7:59–62, 8:31–36, 8:55–58, 9:20–22, 10:35–42, Fig. 7 (712), and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br>**<u>Function:</u>** detect signals on the cable interface<br>**<u>Structure:</u>** Indefinite |
| "logic to discover a transmitting device" ('231 Patent, Claim 16) | No construction necessary. This claim term does not invoke § 112 ¶ 6. Alternatively, should § 112 ¶ 6 apply:<br>**<u>Function:</u>** "discover a transmitting device coupled with the receiving device"<br>**<u>Structure:</u>** "Abstract, 1:62–65, 3:22–24, 4:24–30, 4:40–42, 7:4–9, 8:27–31, 8:5558, 9:13–19, 10:35-42, Fig. 7 (710), Fig. 8 (832), 1:65–2:3, 3:24–26, 6:54–7:3, 7:17–21, 8:9–19, 8:55–59, 10:35–42, and equivalents thereof" | Subject to 35 U.S.C. § 112 ¶ 6<br>**<u>Function:</u>** discover a transmitting device coupled with the receiving device<br>**<u>Structure:</u>** Indefinite |

The parties dispute whether these are means-plus-function terms. If they are, the parties agree on the recited function, but dispute whether the specification discloses adequate corresponding structure.

#### 1. *Whether these are means-plus-function terms*

The parties generally make the same arguments they do for the previous "logic to . . ." terms. For the same reasons, the Court holds these are means-plus-function limitations.

*2. Whether the specification discloses corresponding structure*

These claims have an unusual structure. Both phrases appear in conventional means-plus-function format, but are open ended, and include within them the four "logic to" terms analyzed *supra*. For example, Claim 10 recites "logic to detect signals on the cable interface, the logic including [but not limited to]" the first and second "logic to detect" limitations already discussed. Similarly, Claim 16 recites "logic to discover a transmitting device" that includes, the first and second "logic to detect."

Having reviewed the disclosure, the Court concludes the specification discloses the structure recited in both the "logic to detect" and "logic to discover" limitations. Accordingly, for each claim, the corresponding structure is the structure already recited in the "first logic to" and "second logic to" limitations for each of these terms.

**J. "synchronization primitive" ('798 Patent, Claims 11, 19, 28)**

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary. Plain and ordinary meaning.<br>Alternatively, "a sequence of **one or more** out-of-band synchronization symbols" | "a sequence of **two** out-of-band synchronization symbols" |

These claims recite a "synchronization primitive" that helps properly align a packet of symbols. For example, Claim 11 recites:

> 11. A method for identifying packet types of packets of symbols, the method comprising:
>
> receiving a synchronization symbol by a receiver indicating a packet type, each packet type having a different synchronization symbol;
>
> receiving a packet of symbols;
>
> indicating that the received packet of symbols has the packet

> type of the received synchronization symbol; and
>
> the synchronization symbol permitting properly alignment upon receiving with a **synchronization primitive** to be correctly aligned on a symbol boundary.

’798 Patent at 37:51–38:3 (emphasis added); *see also id.* at 38:28–33 (reciting, in Claim 19, a transmitted synchronization symbol . . . permitting an external receiving node to properly align with a *synchronization primitive* to be correctly aligned on a symbol boundary, and that transmits the symbols of the packet” (emphasis added)), 38:55–57 (limiting, in Claim 28, the “synchronization primitive” of Claim 19 to “known symbols that, when detected, allows a receiving device to identify a symbol boundary”).

The parties only dispute whether a synchronization primitive is exactly two symbols. LGL points to what it considers lexicography, where the specification explains “a primitive is defined as a sequence of two out-of-band symbols.” Dkt. No. 113 at 9 (quoting ’798 Patent at 25:64–65). UCT denies any lexicography, suggesting the language on which LGL relies only concerns a specific embodiment. Dkt. No. 109 at 20. UCT says other embodiments confirm a “synchronization primitive” can be only one symbol. *Id.*

The Court agrees with LGL. First, despite UCT’s assertions, it has not shown applying the purported definition would exclude embodiments. UCT points to the specification’s description of an IDLE primitive, suggesting that because that primitive could be one or more out-of-band symbols so could a “synchronization primitive.” Dkt. No. 109 at 21. But the specification merely suggests an IDLE primitive *can* be a synchronization primitive—not that it *must* be. Thus, that the IDLE primitive is disclosed as being one or more out-of-band symbols doesn’t contradict the purported lexicography.

UCT also says the definition only applies to Figure 22, Dkt. No. 117 at 7, but a skilled

artisan would read the language as applying to the entire specification. The embodiment described with reference to Figure 22 specifically shows out-of-band symbols selected to have minimal impact on DC-balance. In Figure 22, then, the disparity of a primitive is selected to be as close to 0 as possible, and the related description explains how to do that. ’798 Patent at 25:66–26:1.

Finally, UCT’s reliance on the claims is not helpful to its position. It says the claims confirm that a synchronization primitive is not limited to two symbols, because certain dependent claims limit the primitive to an open ended “sequence of bit string synchronization symbols.” Dkt. No. 109 at 20–21. But that is also not inconsistent with the purported definition, as two out-of-band symbols are “made up of a sequence of bit-string synchronization symbols.”

Here, the specification clearly and explicitly defines the disputed term to be two or more symbols. Nothing in the intrinsic record contradicts that definition. Accordingly, the Court adopts LGL’s construction of “a sequence of two out-of-band synchronization symbols.”

### K. “periodically” (’231 Patent, Claim 10)

| UCT’s Construction | LGL’s Construction |
|---|---|
| No construction necessary. Plain and ordinary meaning.<br>Alternatively, “occurring in regular, repeated cycles or irregular intervals of time” | “occurring in regular, repeated cycles” |

Claim 10 recites “a second logic to detect signals on the control bus, the transmitter to drive a first signal value on the control bus *periodically* upon transitioning to the pending state.” ’231 Patent at 12:66–13:2 (emphasis added). The parties dispute whether “periodically” means “from time to time,” or whether it requires regularity.

“Periodically” does not appear in the specification, but LGL says the specification consistently describes that a transmitter, when attempting to be discovered by a receiving device,

alternates pulsing and floating the control bus for the same period of time. Dkt. No. 113 at 28. It also cites technical dictionaries that define "periodic" as having regular repeated intervals. *Id.* UCT says LGL's construction falls within the scope of the term, but that scope does not exclude irregular intervals.

The Court agrees with LGL. To start, the Court disagrees that both interpretations fall within the full scope of the term. "Periodically" has a precise meaning in the context of science and engineering, and a lay meaning like "occasionally" to others. These are distinct definitions with different scope, and courts choose which is applicable when considering the term in light of the specification. Here, the parties generally agree a skilled artisan is an electrical engineer or computer scientist, see Part III *supra*, and such a person would favor the more technical meaning.

That more technical meaning is supported by the specification. Although "periodically" is not used in the disclosure, the patent teaches repeatedly pulsing the control bus and then "tri-stating" the control bus for 1 ms. The patent does not, however, disclose an embodiment in which the control bus is pulsed in an irregular, or "aperiodic," manner. UCT points to the specification's description that "[i]f the transmitting device is in a disconnect state and a predetermined voltage is detected on the power bus, the transmitting device is transitioned to a pending state and the control line is driven with a signal pulse," '231 Patent at 2:7–10, but "driven with a signal pulse" suggests regularity, such as by using a pulse generator.

Based on this record, the Court rejects UCT's position that "periodically" includes both regular and irregular intervals of time, and adopts LGL's construction of "occurring in regular, repeated cycles."

### L. "standard protocol" and "modified protocol" ('520 Patent, Claims 1, 12, 19; '231 Patent, Claim 18)

| UCT's Construction | LGL's Construction |
|---|---|
| No construction necessary | **"standard protocol":** "a communication protocol that was standardized as of the January 4, 2008, filing date of the ['520/'231] Patent"<br>**"modified protocol":** "a communication protocol that is a modification of the standard protocol and that was available as of the January 4, 2008, filing date of the ['520/'231] Patent" |

Each of these claims refers to both a "standard protocol" and a "modified protocol." For example, Claim 16 of the '231 Patent recites:

> logic to discover a transmitting device coupled with the receiving device, wherein the logic includes:
>
> a first logic to detect a first signal on the control bus, the receiving device to discover a **first type** of transmitting device and transition to a first state when the first signal is detected . . . , and
>
> a second logic to detect a power signal from the receiving device, the receiving device to discover a **second type** of transmitting device and transition to a second state when the power signal is detected.

'231 Patent at 13:23–14:11 (emphasis added). Claim 18 then recites, "The receiving device of Claim 16, wherein the second type of transmitting device is compatible with a **standard protocol**, and wherein the first type of device is compatible with a **modified protocol**." *Id.* at 14:15–18 (emphasis added).

LGL asserts these terms must be limited to protocols that were in effect on the filing dates of the patents. Dkt. No. 113 at 24. Citing *PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005), it stresses "[a] claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date." *Id.*

UCT counters that these are relative terms that do not require reference to a specific protocol. They stress LGL took the same position in a related IPR, where it explained the "[t]he '520 Patent describes a 'modified protocol' as a relative term in comparison to a "standard protocol' . . . . The '520 patent describes that this need for a modified/mobile protocol arises from the difficulty of using an interface designed for a standard device with smaller devices, such as mobile devices." Dkt. No. 109 at 26 (quoting Petition for Inter Partes Review, Dkt. No. 109-8 at 41).

The Court agrees with UCT. In *PC Connector*, the claims at issue recited "an end user computer peripheral device having an input/output port normally connectible to a conventional computer," and "separate end user computer peripheral[s] . . . traditionally connectable to a computer by means of an input/output port of the computer and the standard input/output port of the particular separate computer peripheral." *PC Connector*, 406 F.3d at 1361. The appellate court recognized that words like "normally," "conventional," "traditional," and "standard" have ordinary meanings that "are implicitly time-dependent." *Id.* at 1363. PC Connector argued that the disputed claim language "merely clarif[ied] the manner of connecting peripherals to a computer—*i.e.*, through dedicated I/O ports typically clustered at the rear of the chassis—without imposing a time-based limitation on the I/O technologies involved." *Id.* at 1362–63. Ultimately, the court found "nothing in the written description that amounts to a clear attempt by the patentee to impart any special meaning to the words 'normally,' 'conventional,' 'traditionally,' or 'standard.'" *Id.* at 1363.

The key difference from *PC Connector* is the temporal frame of reference between the two terms. Here, "standard" is not used by itself, but rather in juxtaposition to "modified," and the use of the latter in combination with the former emphasizes that what matters in these claims is not the protocol itself, but the difference between the two related versions of the same protocol. In other words, unlike the patent at issue in *PC Connector*, the specifics of any protocol are unimportant to

the claim. Accordingly, the Court holds the use of "standard protocol" and "modified protocol" are not limited to protocols in existence on the filing dates of the patent and construes these terms as "a standardized communication protocol" and "a modification of the standard protocol that is not included in the standard protocol," respectively.

### M. "the first synchronization signal" ('103 Patent, Claim 17)

| UCT's Construction | LGL's Construction |
|---|---|
| The Court should revise Claim 17 to depend on Claim 12 instead of Claim 11 | Indefinite |

This is an antecedent-basis dispute. Claim 17 recites "[t]he method of claim 11, further comprising aligning a boundary of a symbol in a first forward unit of data of the forward units of data using the first synchronization signal." '103 Patent at 11:40–42. Claim 11, however, does not introduce a "first synchronization signal." UCT seeks judicial correction to cause the claim to depend from Claim 12 instead of Claim 11, but LGL says that would not fix the issue.

The Court agrees with LGL. First, UCT does not dispute that the claim as written is indefinite. There are multiple reasonable ways to "correct" the claim. For example, rather than changing the dependency, the Court could correct "*the* first synchronization signal" to "*a* first synchronization signal." Or it could implement the correction urged by UCT, but that would, as LGL notes, create ambiguity about whether the "a first forward unit of data" recited in Claim 17 is the same or different than the "a first forward unit of data" recited in Claim 12. Or the Court could correct the dependency to any one of Claims 13–16, all of which depend from Claim 12. Because all of these are reasonable options, judicial correction is not appropriate. See *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022) (noting "[c]orrection is appropriate 'only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the

specification and (2) the prosecution history does not suggest a different interpretation of the claims'") (quoting *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)).

## V. CONCLUSION

| Disputed Term | The Court's Construction |
| --- | --- |
| "a preemption component"<br>('905 Patent, Claims 21) | Plain and ordinary meaning |
| "an identification component"<br>('798 Patent, Claim 21) | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** identifies a packet type of a packet of symbols<br>**Structure:** "a general-purpose processor, special-purpose processor, or logic circuit programmed to determine whether the packet was removed from a control queue or a data queue, and send an indication of whether the packet was removed from the control queue or the data queue to the transport layer" |
| "logic to convert each of one or more control signals into a data packet"<br>('520 Patent, Claim 12) | Subject to 35 U.S.C. § 112 ¶ 6<br>**Function:** convert each of one or more control signals into a data packet, each of the one or more control signals being one of a plurality of different types of control signals for a standard protocol, each data packet including a plurality of bits to be transmitted<br>**Structure:** "a general-purpose processor, special-purpose processor, or logic circuit programmed to form control signal bytes into data packets that include (1) a header field indicating the type of the packet, and (2) a control field identifying whether the packet is carrying data or a command, and equivalents thereof" |

| | |
|---|---|
| "logic to convert each of the one or more data packets into a control signal"<br>('520 Patent, Claim 19) | Subject to 35 U.S.C. § 112 ¶ 6<br><br>**Function:** convert each of the one or more data packets into a control signal<br><br>**Structure:** "a general-purpose processor, special-purpose processor, or logic circuit programmed to (1) identify the packet type from a header of a received packet, and (2) identify whether the packet is data or a command from a control field of the received packet, and equivalents thereof" |
| "logic to arbitrate use of the first control bus"<br>('520 Patent, Claim 12) | Subject to 35 U.S.C. § 112 ¶6<br><br>**Function:** to arbitrate use of the first control bus, the logic to arbitrate use being operable to: [i] determine whether the control bus is in use by the receiving device, and [ii] if the first control bus is not in use by the receiving device, conduct arbitration for control of the first control bus<br><br>**Structure:** "a general-purpose processor, special-purpose processor, or logic circuit programmed with instructions to perform Steps 304–322 of Figure 3, and equivalents thereof" |

| | |
|---|---|
| "logic to arbitrate use of the first control bus"<br>('520 Patent, Claim 19) | Subject to 35 U.S.C. § 112 ¶6<br><br>**<u>Function:</u>** to arbitrate use of the first control bus, the logic to arbitrate use being operable to: [i] determine whether the control bus is in use by the transmitting device, and [ii] if the first control bus is not in use by the transmitting device, conduct arbitration for control of the first control bus [cl. 19]<br><br>**<u>Structure:</u>** "a general-purpose processor, special-purpose processor, or logic circuit programmed with instructions to perform Steps 304–322 of Figure 3, and equivalents thereof" |
| "first logic to detect a voltage value on the power bus"<br>('231 Patent, Claim 10) | Subject to 35 U.S.C. § 112 ¶ 6<br><br>**<u>Function:</u>** detect a voltage value on the power bus<br><br>**<u>Structure:</u>** "a voltage detector with an input connected to the pin of the transmitter that is connected to the power bus, and equivalents thereof" |
| "second logic to detect signals on the control bus"<br>('231 Patent, Claim 10) | Subject to 35 U.S.C. § 112 ¶6<br><br>**<u>Function:</u>** detect signals on the control bus<br><br>**<u>Structure:</u>** "a voltage detector with an input connected to the pin of the transmitter that is connected to the control bus, and equivalents thereof" |
| "first logic to detect a first signal on the control bus"<br>('231 Patent, Claim 16) | Subject to 35 U.S.C. § 112 ¶ 6<br><br>**<u>Function:</u>** detect a first signal on the control bus<br><br>**<u>Structure:</u>** "a voltage detector with an input connected to the pin of the receiver that is connected to the control bus, and equivalents thereof" |

| | |
|---|---|
| "second logic to detect a power signal"<br>('231 Patent, Claim 16) | Subject to 35 U.S.C. § 112 ¶6<br>**<u>Function:</u>** detect a power signal from the receiving device<br>**<u>Structure:</u>** "a voltage detector with an input connected to the pin of the receiver that is connected to a power signal line, and equivalents thereof" |
| "logic to detect signals on the cable interface"<br>('231 Patent, Claim 10) | Subject to 35 U.S.C. § 112 ¶ 6<br>The corresponding structure is defined by the subparts of the limitation. |
| "logic to discover a transmitting device"<br>('231 Patent, Claim 16) | Subject to 35 U.S.C. § 112 ¶ 6<br>The corresponding structure is defined by the subparts of the limitation. |
| "synchronization primitive"<br>('798 Patent, Claims 11, 19, 28) | "a sequence of two out-of-band synchronization symbols" |
| "periodically"<br>('231 Patent, Claim 10) | "occurring in regular, repeated cycles" |
| "standard protocol"<br>('520 Patent, Claims 1, 12, 19; '231 Patent, Claim 18) | "a standardized communication protocol" |
| "modified protocol"<br>('520 Patent, Claims 1, 12, 19; '231 Patent, Claim 18) | "a modification of the standard protocol that is not included in the standard protocol" |
| "the first synchronization signal"<br>('103 Patent, Claim 17) | Indefinite |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that

contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 15th day of September, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE